IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| RAYMOND M. GEE and ADAM M. MARTIN, | ) ) ) |
| Plaintiffs, | ) ) ) No. 9:18-cv-02755-DCN |
| vs. | ) ) ORDER |
| DELTA SPEIR PLANTATION LLC and JAMES S. SHAW, | ) ) ) ) |
| Defendants. | ) ) |

The following matter is before the court on defendant Delta Speir Plantation LLC's ("Delta") partial motion to dismiss, ECF No. 26. For the reasons set forth below, the court grants in part and denies in part the motion.

## I. BACKGROUND

In 2010, defendant James S. Shaw ("Shaw") allegedly requested assistance from plaintiffs Raymond M. Gee ("Gee") and Adam M. Martin ("Martin") (collectively, "plaintiffs") in assessing the investment value of a tract of land in Jasper County known as Delta Bluffs. Shaw is the sole member and manager of Delta through Shaw's solely owned entity, JS Real Estate Investments LLC. Plaintiffs agreed to help Shaw, investigated the property, and made an assessment regarding Delta Bluffs's investment value. In 2011, Shaw allegedly verbally agreed to pay plaintiffs 20% of any profit he made from selling any portion of Delta Bluffs as compensation for plaintiffs' work. Plaintiffs continued to work on the due diligence and underwriting of Delta Bluffs, and they also met with Jasper County officials, local real estate professionals, and attorneys in

order to assist Shaw in acquiring Delta Bluffs.  Shaw eventually purchased Delta Bluffs at a public auction in December 2011.

Shaw then allegedly sought plaintiffs' assistance in setting up a tax-advantaged donation of 100 acres of Delta Bluffs to Savannah College of Art and Design ("SCAD").  In order to realize the tax savings from this donation, Shaw allegedly requested that plaintiffs close the donation transaction by the end of 2012, which plaintiffs did.  Plaintiffs allege that Delta and/or Shaw realized at least $2.5 million in tax savings as a result.  In 2014, the parties entered into a written agreement ("the Agreement").  The Agreement put the parties' verbal agreement regarding profit sharing from the sale of Delta Bluffs into writing, and it also required Delta to pay plaintiffs 20% of any federal or state tax savings realized from the land donation to SCAD in return for plaintiffs' assistance in the donation.  The parties agreed that any payment based on tax savings would be due upon the expiration of the risk of a state or federal tax audit.  In addition, the Agreement contains a merger clause that states that the Agreement "encompasses the entire agreement between the parties."  ECF No. 19-1 at 1.

Plaintiffs allege that in early 2015, Shaw again requested and received plaintiffs' help in renewing an expiring wetland permit on Delta Bluffs.  After that, there was no more communication between the parties regarding Delta Bluffs.  Then in early 2016, Delta allowed several hundred acres of trees on Delta Bluffs to be harvested for timber.  Plaintiffs allege that Delta received at least $2 million for this transaction, and plaintiffs are entitled to $400,000, pursuant the Agreement's term that plaintiffs will receive 20% of any profit made from selling a portion of Delta Bluffs.  Plaintiffs further allege that the time period for a tax audit on SCAD donation expired in 2016, and as a result, plaintiffs

are owed $501,600, which is allegedly 20% of the tax savings from the donation. Plaintiffs demanded payment of $901,600 in March 2017, and Delta has not yet paid them.

Plaintiffs filed this action in the Court of Common Pleas for the County of Jasper, South Carolina on September 5, 2018. Delta removed the action on October 10, 2018. Then Delta filed a motion to dismiss on October 17, 2018, ECF No. 7, which was fully briefed; however, the complaint's allegations were insufficient for the court to determine which state law to apply, so the court instructed plaintiffs to amend their complaint in order to address the choice-of-law issue. Plaintiffs filed their amended complaint on January 31, 2019. ECF No. 19. The amended complaint levies claims for breach of contract against Delta and for quantum meruit against both Delta and Shaw. Delta filed a partial motion to dismiss on March 7, 2019, ECF No. 26, asking the court to dismiss plaintiffs' breach-of-contract claim. Plaintiffs responded to the motion on March 21, 2019, ECF No. 28, and Delta replied on March 28, 2019, ECF No. 32. The court held a hearing on the motion on May 13, 2019. The motion is now ripe for review.

## II. STANDARD

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

3

8(a)(2). A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999); Mylan Labs., Inc., 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III. DISCUSSION

Delta argues that plaintiffs' breach-of-contract claim should be dismissed because no event in the Agreement has occurred to trigger payment to plaintiffs. First, Delta contends that Delta's sale of timber does not qualify as selling "a portion of Delta Bluffs" and therefore plaintiffs are not entitled to a portion of that profit. Next, Delta argues that the risk of a state or federal tax audit on the SCAD transaction has not expired due to a consent restraining order between the United States and Shaw, meaning plaintiffs are not yet entitled to a portion of the tax savings.[1] The court agrees that the sale of timber does not qualify as a sale of a portion of Delta Bluffs, meaning that plaintiffs are not entitled to

---

[1] Delta concedes that the dismissal of this portion of the claim should be without prejudice, as the risk of a tax audit may eventually expire.

a portion of the profit from that sale. However, the court finds that the consent restraining order does not create an ongoing risk of a tax audit, meaning that the risk of a tax audit has expired and plaintiffs' breach-of-contract claim as to their entitlement to a portion of defendants' tax savings may proceed.

### A. Sale of Timber as a Triggering Event

Delta first argues that plaintiffs are not entitled to a portion of the profit from the sale of timber on Delta Bluffs because under the UCC, as adopted by South Carolina, [2] the sale of timber is the sale of a good, not real property, and therefore not "a portion . . . of Delta Bluffs." Delta explains that the Agreement entitles plaintiffs to 20% of the profits from the "sale of a portion or all of Delta Bluffs." ECF No. 19-1 at 1. The Agreement identifies Delta Bluffs as "a parcel of land." Id. While Delta concedes that the Agreement does not define "portion," Delta argues that because "portion" is defined by the American Heritage College Dictionary as "[a] section or quantity within a larger thing; a part of a whole," the plain language of "a portion . . . of Delta Bluffs" describes a section of the real property of Delta Bluffs. ECF No. 26-1 at 7. Delta argues that because timber became a good when the contract for its sale was effectuated, it cannot be considered as a section of Delta Bluffs's real property, and therefore plaintiffs are not entitled to a portion of the profit from the sale of timber.

Plaintiffs disagree, arguing that timber was part of the real property of Delta Bluffs at the time of the creation of the Agreement and as such, they are entitled to a portion of the sale of timber. They also respond that the sale of timber fits within the

---

[2] Both parties have agreed that for the purposes of Delta's partial motion to dismiss, South Carolina law should apply. ECF No. 26-1 at 2 n.1; ECF No. 28 at 2 n.1.

5

Agreement's definition of "profit," which is "proceeds from a sale . . . relating to transactions regarding the property (i.e. donations, etc.)." ECF No. 19-1 at 1. Plaintiffs go on to explain that the use of the word/abbreviation "etc." means that there are essentially no limitations on the type of transaction for which plaintiffs would be entitled to a share of the profit. As a result, plaintiffs contend that they should receive 20% of the timber profit.

In South Carolina, "[c]ontract interpretation begins with the plain language of the agreement." Stevens Aviation, Inc. v. DynCorp Int'l LLC, 756 S.E.2d 148, 152 (S.C. 2014). "In construing a contract, it is axiomatic that the main concern of the court is to ascertain and give effect to the intention of the parties." D.A. Davis Const. Co. v. Palmetto Properties, Inc., 315 S.E.2d 370, 372 (S.C. 1984). In doing so, "the intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument." Silver v. Aabstract Pools & Spas, Inc., 658 S.E.2d 539, 542 (S.C. Ct. App. 2008). If the language of the contract is capable of only one reasonable interpretation, "no construction is required and the contract's language determines the instrument's force and effect." Ellie, Inc. v. Miccichi, 594 S.E.2d 485, 493 (S.C. Ct. App. 2004). However, when a contract is capable of more than one construction, the question of the parties' intent should be submitted to a jury. Cafe Associates, Ltd. v. Gerngross, 406 S.E.2d 162, 164 (S.C. 1991). Moreover, when a merger clause exists that expresses the parties' intention to treat the agreement as completely integrated, the terms of the agreement cannot be altered by parol evidence. Wilson v. Landstrom, 315 S.E.2d 130, 134 (S.C. Ct. App. 1984).

The parties both agree that the timber was part of the real property of Delta Bluffs up until there was a contract for its sale. Delta argues that once the timber contract was effectuated, the timber became a good. Under the UCC, as adopted by the Code of Laws of South Carolina, the sale of timber is a sale of a good, not a sale of real property. S.C. Code Ann. § 36-2-107. This is true "even though [the timber] forms part of the realty at the time of contracting [for its sale]." Id. While there is little case law on the issue, courts have consistently viewed timber as a good in the context of a sale of timber. See Holmes v. Westvaco Corp., 347 S.E.2d 887, 888 (S.C. Ct. App. 1986) (viewing a contract for the sale of timber as a contract for the sale of goods); Atl. Coast Lumber Corp. v. E.P. Burton Lumber Co., 71 S.E. 820, 821 (S.C. 1911) (explaining that once timber is cut, it becomes personal property); Calhoun v. Cullum's Lumber Mill, Inc., 545 S.E.2d 41, 44 (Ga. 2001) (applying South Carolina law) ("When the sale of timber is at issue, the court views timber as a good.").

Plaintiffs argue that South Carolina common law has historically considered timber as part of the real property. This is true, but not in the context of the sale of timber. For example, in Nat'l Tr. Ins. Co. v. Carolina Timber, Inc., the court considered how to classify timber in a context of interpreting an insurance policy. 2014 WL 12615709, at *3 (D.S.C. Dec. 18, 2014). The court held that damage to timber fell within an insurance policy's damage to property exclusion because South Carolina law classifies timber as real property. Id. In that case, the timber was still considered real property because it was attached to the land when it was damaged and importantly, it was not sold to anyone. Plaintiffs cite to other South Carolina cases in which the court considered timber to be part of the real property, but those cases also do not involve the sale of

timber. See D.W. Alderman & Sons Co. v. Kirven, 40 S.E.2d 791, 794 (S.C. 1946) (considering whether the taking of timber is larceny); First Carolina Joint Stock Land Bank of Columbia v. N.Y. Title & Mortgage Co., 174 S.E. 406, 408 (S.C. 1934) (dispute whether timber should be included as part of the land that was mortgaged). Moreover, the court in D.W. Alderman & Sons Co. articulated the rule that Delta argues for: "trees growing upon lands are a part of the realty, and continue to be realty until severed from the soil." 40 S.E.2d at 794 (emphasis added). Therefore, in the context of the sale of timber, South Carolina law clearly considers timber to be a good. This context is important, because the Agreement only entitles plaintiffs to profits "[u]pon the sale of a portion . . . of Delta Bluffs." ECF No. 19-1 at 1 (emphasis added).

Plaintiffs argue that timber should be considered part of Delta Bluffs's real property because at the time the Agreement was formed, the timber was not sold and therefore still part of Delta Bluffs's real property. However, this argument is unconvincing given the plain language of the Agreement that defines the relevant time period for triggering payment to plaintiffs as "the sale of a portion . . . of Delta Bluffs." ECF No. 19-1 at 1. And once the sale of timber occurs, it is no longer part of the real property but instead becomes a good. Therefore, the fact that the timber was part of Delta Bluffs's real property at the time of the Agreement has no effect here. In an apparent attempt to avoid this qualifying language, plaintiffs' counsel argued for the first time at the hearing on the motion that plaintiffs have not confirmed that the timber was actually sold. However, plaintiffs allege in their amended complaint that "the Defendants profited from the sale of timber rights." Compl. ¶ 30 (emphasis added). Therefore, this argument is unconvincing.

Plaintiffs also rely on Epstein v. Coastal Timber Co., Inc., 711 S.E.2d 912 (S.C. 2011), in support of their argument; however, Epstein is inapplicable here because it considered the effect of a timber sale in the narrow context of mortgages and priority of security interests. In Epstein, the plaintiff/mortgagee held a mortgage on a piece of property. 711 S.E.2d at 914. The owner/mortgagor of the property sold timber on the property to the defendant and then defaulted on his obligations to the plaintiff. The plaintiff brought a foreclosure action against the mortgagor and subsequently filed suit against the defendant seeking a portion of the proceeds of the sale of timber. Id. at 914–15. In considering the plaintiff's claim, the court noted that South Carolina common law has traditionally defined timber as part of real property that is subject to a mortgage but also acknowledged the UCC's designation of a timber sale as a sale of goods. Id. at 915–16. Despite these opposing views, the court determined that "the UCC can be read in harmony with the common law so as to give full effect to each." Id. at 917. The court found that UCC applies specifically to "timber to be cut under a contract of sale" and does "not cancel the effect of a mortgage or lien on timber that is already recorded in the real estate records." Id. at 917–18. According to the court, "[t]he purpose of the UCC amendment was, as noted above, to facilitate the financing of a transaction to purchase timber by treating timber to be cut under a contract of sale as a sale of goods, even though the timber is still attached to the land, and to provide a method for a purchaser to document a security interest in such timber under contract." Id. at 917. As such, the court found that the UCC "do[es] not cancel the effect of a mortgage or lien on timber that is already recorded in the real estate records," and that the plaintiff's mortgage secured a lien on both the property and the timber. Id. at 918–19.

The Epstein court considered the UCC definition of timber as goods in the narrow context of mortgages and securities. Indeed, the court simply held that "[t]he UCC changes did not effect a wholesale cancellation of existing real estate law in South Carolina and did not convert all standing timber to 'goods.'" Id. at 919 (emphasis added). However, here the question is simply how to classify the sale of timber for the purposes interpreting the Agreement. There is no issue related to whether plaintiffs secured a lien on Delta Bluffs and its timber, and whether that lien is still valid after the sale of the timber. The Agreement entitles plaintiffs to a portion of the "sale of a portion . . . of Delta Bluffs." ECF No. 19-1 at 1. And because, under the UCC, the sale of timber is a sale of goods, it is not a sale of a portion of Delta Bluff's real property.

Moreover, despite plaintiffs' contention, the definition of "profit" does not entitle plaintiffs to any profit from the sale of timber. The inclusion of the term "etc." in defining the types of transactions that may generate profit suggests that the parties intended a wide interpretation of the type of transactions that could generate profit. But the Agreement contains the qualifying language that plaintiffs are only to be paid a portion of the profit generating from a transaction "[u]pon sale of a portion or all of Delta Bluffs." ECF No. 19-1 at 1. So while the term "profit" could encompass a variety of transactions, the issue here is that the event that triggers plaintiffs' share of that profit is the sale of the real property of Delta Bluffs. Without the sale of the real property of Delta Bluffs, plaintiffs are not entitled to a share of profits, no matter what type of transaction produced the profit.

Plaintiffs also allege that Shaw was impressed by Delta Bluffs's profit potential from "the sale of all or portions of [Delta Bluffs], including timber, wetland credits,

conservation easements and tax savings donations." Am. Compl. ¶ 13. Plaintiffs define this as "profit transactions" in the amended complaint, presumably in an attempt to argue that a "sale of a portion . . . of Delta Bluffs" as defined in the Agreement includes the sale of timber. However, this term and definition of "profit transactions" does not appear anywhere in the Agreement, and because the Agreement contains a merger clause, plaintiffs cannot introduce any parol evidence to add this term and definition. Therefore, the fact that plaintiffs could have had reason to believe that they would be entitled to share of profits from selling timber does not play a role into the court's interpretation of the four corners of the Agreement. If plaintiffs had wanted to define the type of transactions to which they would be entitled to profit, they should have done so in the Agreement, not in their amended complaint. In conclusion, because plaintiffs are only entitled to a share of profit upon the sale of a portion of Delta Bluffs's real property, and because the sale of timber is a sale of goods, plaintiffs are not entitled to share of the profit from the sale of timber. As such, the court dismisses the portion of plaintiffs' breach-of-contract claim seeking a portion of the profit from the timber sale.

**B. Expiration of Tax Risk**

Delta next argues that plaintiffs are only entitled to a percentage of its tax savings "once the risk of a federal or state tax audit has expired," and that risk has not expired due to a consent restraining order between the United States and Shaw. At the hearing on the motion, Delta's counsel explained that once the consent restraining order was superseded or resolved, then the risk of the tax audit will have expired. The consent restraining order was filed in a case in the United States District Court for the Northern District of Georgia in which the government filed a complaint for forfeiture against Shaw

and his business entities, including JS Real Estate Investments LLC.  The consent restraining order was not attached to or mentioned in the complaint, but Delta attached it to its partial motion to dismiss.

A court "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016).  Plaintiffs argue that the consent restraining is not integral to the amended complaint but then argue that "it is of no matter, because it does not affect the three-year audit period for [Delta]'s tax return."  ECF No. 28 at 10.  Given plaintiffs' stance, the court considers the consent restraining order to determine whether it affects the tax audit period and finds that it does not impose any ongoing risk of a tax audit.

The Agreement states that plaintiffs are entitled to 20% of Delta's tax savings "once the risk of a federal or state tax audit has expired."  ECF No. 19-1 at 1.  The Agreement anticipates the risk to expire in October 2016.  Id.  The Internal Revenue Service ("IRS") generally has three years from the filing of a tax return to audit the return.  26 U.S.C. § 6501(a).  According to the amended complaint, the three-year audit time period for the SCAD donation expired in 2016; therefore, plaintiffs argue that they are now entitled to 20% of the tax savings from that donation.  Delta contends that, despite expiration of the three-year period, the consent restraining order creates a continuing risk of a tax audit because the order states that it has "no effect on any . . . tax-related action that has been or may be brought against any of the Parties or anyone else as a result of the facts and circumstances giving rise to this action and to the seizures

referenced herein." ECF No. 26-3 at 14 (emphasis added by Delta). Delta argues that this language means that the government is reserving its right to take tax-related action against Shaw or any entity he owns, including JS Real Estate Investments LLC. As a result, Delta argues, the risk of a tax audit has not expired, and plaintiffs are not entitled to be paid yet. However, plaintiffs disagree with this interpretation and argue that the language means the exact opposite—the consent restraining order has no effect on this case, and it does not preclude plaintiffs from entitlement to 20% of Delta's tax savings.

The court agrees with plaintiffs' interpretation. The language of the consent restraining order clearly states that it will have "<u>no effect</u> on any . . . tax-related action." ECF No. 26-3 at 14 (emphasis added). This means the consent restraining order does not alter the normal three-year audit period. There is nothing in this language or anywhere else in the consent restraining order suggesting that the order tolls the period in which the IRS could audit defendants. As such, the consent restraining order does not necessitate the dismissal of the tax portion of plaintiffs' breach-of-contract claim.

## IV. CONCLUSION

For the reasons set forth above, the court grants in part and denies in part the partial motion to dismiss plaintiffs' breach-of-contract claim.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**May 16, 2019
Charleston, South Carolina**